UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————x

JAMIE AND MARK DIROCCO, on behalf of
their son, M.D.,

                        Plaintiffs,

    - against -

THE BOARD OF EDUCATION OF BEACON
CITY SCHOOL DISTRICT, and THE BEACON
CITY SCHOOL DISTRICT

                     Defendants.

———————————————————————x

**OPINION AND ORDER**

11 Civ. 3897 (ER)

     Plaintiffs Jamie and Mark DiRocco (the "Parents"), on behalf of their minor child, M.D. (collectively the "Plaintiffs"), bring an action against the defendants Board of Education of Beacon City School District and the Beacon City School District (collectively "Defendants" or the "District") under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1415(e)(2), and New York Education Law § 4404.3, challenging the District's placement of their son and seeking reimbursement for his private school tuition.  Plaintiffs brought this appeal from a decision of the State Review Officer, who found in favor of the District.  The parties have filed cross-motions for summary judgment.  Docs. 9, 11.  For the reasons set forth below, Plaintiffs' motion for summary judgment is DENIED and the Defendants' motion for summary judgment is GRANTED.

### I.   Statutory Framework

     Congress enacted the IDEA to encourage the education of children with disabilities. *E.A.M. ex rel. E.M. v. N.Y.C. Dep't of Educ.*, 11 Civ. 3730 (LAP), 2012 WL 4571794, at *1 (S.D.N.Y. Sept. 29, 2012) (citing *Bd. of Educ. v. Rowley*, 458 U.S. 176, 179 (1982)).  Under the statute, any state receiving federal funds must provide a free appropriate public education

("FAPE") to disabled children.  20 U.S.C. § 1412(a)(1)(A); *Rowley*, 458 U.S. at 179.  To satisfy

its obligation, the FAPE provided by the state must include "special education and related

services" tailored to meet the unique needs of the particular child, 20 U.S.C. § 1401(9), and be

"reasonably calculated to enable the child to receive educational benefits."  *Rowley*, 458 U.S. at

207.

A public school ensures that a student with disabilities receives a FAPE by providing the

student with an Individualized Education Plan ("IEP").  *Polera v. Bd. Of Educ. of Newburgh*

*Enlarged City Sch. Dist.*, 288 F.3d 478, 482 (2d Cir. 2002).  An IEP is a written statement,

collaboratively developed by the parents, educators, and specialists, that "sets out the child's

present educational performance, establishes annual and short-term objectives for improvements

in that performance, and describes the specially designed instruction and services that will enable

the child to meet those objectives."  *Honing v. Doe*, 484 U.S. 305, 311 (1988), *superseded by*

*statute*, *Joshua A. v. Rocklin Unified Sch. Dist.*, 559 F.3d 1036 (9th Cir. 2009).

Because New York State receives federal funds under the IDEA, it must comply with the

requirements of the statute.  *Walczak v. Florida Union Free Sch. Dist.,* 142 F.3d 119, 123 (2d

Cir. 1998).  In New York, the task of developing an IEP rests with local Committees on Special

Education ("CSEs"), whose members are appointed by the board of education or trustees of the

school district.  N.Y. Educ. Law § 4402(1)(b)(1); *Heldman on Behalf of T.H. v. Sobol*, 962 F.2d

148, 152 (2d Cir. 1992).  In developing a child's IEP, the CSE must consider four factors:  "(1)

academic achievement and learning characteristics, (2) social development, (3) physical

development, and (4) managerial or behavioral needs."  *E.A.M. ex rel. E.M.,* 2012 WL 4571794,

at *1 (quoting *Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 107-08 (2d Cir. 2007))

(internal quotation marks omitted).  The IEP must "be reasonably calculated to enable the child

to receive educational benefits," *Gagliardo*, 489 F.3d at 107 (citation and internal quotation marks omitted), "likely to produce progress, not regression," and afford the student with an opportunity greater than mere "trivial advancement." *Cerra v. Pawling Cent. Sch. Dist.*, 427 F.3d 186, 195 (2d Cir. 2005) (quoting *Walczak,* 142 F.3d at 130) (internal quotation marks omitted).  However, a school district is not required to provide "every special service necessary to maximize each handicapped child's potential," *Cerra,* 427 F.3d at 195 (citation and internal quotation marks omitted), or "everything that might be thought desirable by loving parents." *Walczak,* 142 F.3d at 132 (citation and internal quotation marks omitted).  Furthermore, under an IEP, "education [must] be provided in the 'least restrictive setting consistent with a child's needs'" and the CSE must "be mindful of the IDEA's strong preference for 'mainstreaming,' or educating children with disabilities 'to the maximum extent appropriate' alongside their non-disabled peers." *M.H. v. NYC Dep't of Educ.*, 685 F.3d 217, 224 (2d Cir. 2012) (citations omitted).

"Parents may challenge the adequacy of their child's IEP in an 'impartial due process hearing' before an [Impartial Hearing Officer ("IHO")] appointed by the local board of education." *E.A.M. ex rel. E.M.,* 2012 WL 4571794, at *2 (quoting *Gagliardo*, 489 F.3d at 109). The IHO's decision may be appealed to a State Review Officer ("SRO"), and the SRO's decision can be challenged in either state or federal court. *Id.* (citation omitted).  When reviewing the SRO's decision, a district court may "receive the records of the administrative proceedings."  20 U.S.C. § 1415(i)(2)(C).  The district court shall then "grant such relief as the court determines is appropriate," based on the preponderance of the evidence. *Id.*  Under the statute, "appropriate" relief may include reimbursement for the cost of a private school placement. *E.A.M. ex rel. E.M.,* 2012 WL 4571794, at *2.

3

## II. Factual Background[1]

### A. M.D.'s History[2]

M.D. is currently 18 years old.  He was enrolled in the District from kindergarten through the fourth grade, spanning the 1999-2005 school years.  IHO Tr. 1029-30; SD Ex. 1 at 1, 3. M.D. has been diagnosed with a language-based learning disability, dyslexia, anxiety, attention deficit hyperactivity disorder ("ADHD"), and has exhibited dysnomia (a "verbal labeling deficit") and deficits in attentional and executive functioning.  IHO Tr. 345, 379, 571-73, 575-85, 1004, 1053-59, 1062-70, 1205-18, 1225-29.   In February 2003,[3] the District's CSE classified M.D. as a student in need of special education with a learning disability.  *Id.* 1046-47.  M.D. has retained this classification for all subsequent school years; and his classification is not in dispute. IHO Decision ("IHO Dec.") at 1; SRO Dec. at 2.

When M.D. was in the fourth grade, 2004-05,[4] he was placed in an integrated co-teaching ("ICT") classroom[5] with approximately 25 to 26 students.  In this environment, M.D.

---

[1] This case was transferred to the undersigned on January 23, 2012.  Doc. 7.  Pursuant to a schedule and to procedures set by Judge Kenneth M. Karas, the parties exchanged cross-motions for summary judgment without the promulgation of Rule 56.1 Statements.  Doc. 8.   *T.Y. v. N.Y.C. Dep't of Educ.*, 584 F.3d 412, 418 (2d Cir. 2009) (noting that Rule 56.1 Statements are not required in IDEA cases).

[2] The designation of "CSE Tr." refers to the transcript of the April 21, 2009 CSE meeting.  "IHO Tr." refers to the transcript of the impartial hearing conducted between April 19 and September 28, 2010.  "SD Ex." refers to exhibits submitted by the District for the impartial hearing and "P Ex." refers to the Parents' exhibits for the hearing.

[3] As discussed in the SRO's decision, M.D.'s mother testified at the impartial hearing that she believed the CSE found M.D. eligible for special education programs in February 2002, however, the record suggests that this occurred in February 2003.  SRO Decision ("SRO Dec.") at 2 n.5; *compare*, IHO Tr. 1048, *with* SD Ex. 1 at 2-3.

[4] M.D. was in the second grade for two years.  *See* IHO Tr. 1046.

[5] ICT services, as discussed in the New York State regulations, are "specially designed instruction and academic instruction provided to a group of students with disabilities and nondisabled students."  N.Y. Comp. Codes R. & Regs. tit. 8, § 200.6(g).  "School personnel assigned to such a class shall minimally include a special education teacher and a regular education teacher."  N.Y.C.R.R. § 200.6(g)(2).

experienced an increase in anxiety, which prompted the need for private counseling services from January to April 2005.  IHO Tr. 1071-76; SD Ex. 1 at 3.  At the recommendation of his private counselors, M.D. finished the fourth grade at a District alternative school.  IHO Tr. 1076-79, 1088.

In preparation for M.D.'s fifth grade year, 2005-06, the District requested a psychiatric evaluation to determine the source of his anxiety.  *Id.* 1080-81.  According to the Parents, the private psychiatrist concluded that M.D.'s anxiety stemmed from his inability to keep up with his schoolwork and recommended "a small class setting where his learning needs could be targeted appropriately."  *Id.* 1080-81, 1090.[6]  In the summer of 2005, the Parents unilaterally removed M.D. from the District and enrolled their son at The Kildonan School ("Kildonan"), where he remained for four years from the fifth through eighth grades (2005-09 school years).  IHO Tr. 1091, 1480; SD Ex. 1 at 3-5; P Ex. N at 2.

a.  Dr. Mattis' 2007 Neuropsychological Evaluation

In the spring of 2007, when M.D. was in the sixth grade, the Parents obtained a private neuropsychological evaluation of M.D. by Steven Mattis, Ph.D.  SD Ex. 4 at 1; *see also* IHO Tr. 1194-1195.  Dr. Mattis evaluated M.D. over a period of two days.  *Id.*  Testing of M.D. on the Weschler Intelligence Scale for Children-Fourth Edition ("WISC-IV"), which measures cognitive ability, yielded a full scale IQ of 100.  SD Ex. 4 at 2.  Dr. Mattis concluded that M.D. presented a moderate developmental language disorder characterized by moderate to severe dysnomia and mild receptive and expressive components, ADHD, and a significant disorder in expressive writing.  SD Ex. 4 at 9.  M.D.'s language-based learning disability "interact[ed] most unfavorably" with his executive deficits and attentional disorder, which resulted in "mak[ing] the

_____

[6] According to the SRO, the "hearing record does not contain a documentary report relative to this evaluation."  SRO Dec. at 4 n.9.

disorder of a greater magnitude than it would have been with just the nature of the language difficulty itself" and compromising M.D.'s ability to function academically.  SD Ex. 4 at 9; IHO Tr. 1229.  Dr. Mattis also determined that M.D. suffered from impaired spelling skills, especially in the context of expressive writing.  SD Ex. 4 at 9.

As a result of M.D.'s learning disabilities, Dr. Mattis recommended a small class size (8:1) to "sustain his selective attention and persistence on a task" because M.D.'s "attention, executive, and language disorders overwhelm his selective attention, persistence, and creative problem solving."  Id. at 10.  However, Dr. Mattis acknowledged that a small class size was just one way to address M.D.'s learning inhibitors.  For example, he suggested that the inclusion of program modifications and supplementary aids and services could also address M.D.'s difficulty with attention, focus, and executive functions.  IHO Tr. 1324-30.

Dr. Mattis also suggested:  (1) a "linguistic analysis" approach to reading, spelling and writing to improve the relationship of letter order and meaning; (2) the use of a structured and sequential multi-sensory approach in all academic subjects, with M.D. being placed with students sharing similar cognitive abilities; (3) special seating to allow the teacher to bring M.D. back to task and foreshadow instructional transitions within and between classrooms; (4) the use of a word processor for all written work; (5) the appointment of a liaison, such as a school psychologist, between school personnel and the student's "home-based treatment team;" and (6) the use of teachers with formal training and experience teaching children with language-based learning disabilities and concurrent neuropsychological deficits.  SD Ex. 4 at 10.

b. 2008-09 IEP

On August 13, 2008, the District held a CSE meeting to develop M.D.'s eighth grade IEP, school year 2008-09.  P Ex. F at 6.  Individuals in attendance included the CSE chairperson,

the school psychologist, a regular education teacher, a special education teacher, and the Parents. *Id.* Kildonan's Academic Dean was invited to participate via telephone, but he was unable to do so. *Id.* M.D.'s parents rejected the resulting IEP and continued M.D.'s private placement at Kildonan. *Id.*

       c.  <u>2009 Triennial Social History Form</u>

On February 16, 2009, the Parents completed a triennial social history for M.D. on a District-generated form. SD Ex. 5 at 1-3. The Parents indicated that M.D. "continue[d] to have academic success by receiving a program that addresse[d] his individual needs." *Id.* at 1. They also reported that M.D. received speech-language instruction using the Orton-Gillingham method;[7] he liked school, had friends and appropriate peer interaction; he remembered school assignments and completed assigned homework; he enjoyed reading; and his skills were improving. *Id.* at 1-2. Behaviorally, the Parents reported that M.D. learned responsibility, developed positive leadership characteristics, responded to structured situations and respected authority. He showed distractibility and impulsive behavior "some" of the time and "seldom" had discipline problems, showed aggression toward others, or appeared withdrawn or depressed. *Id.*

---

[7] Orton-Gillingham is a "specialized, multisensory teaching method designed to educate students with dyslexia and other learning disabilities." *Viola v. Arlington Cent. Sch. Dist.*, 414 F. Supp. 2d 366, 384 n. 12 (S.D.N.Y. 2006).

### B. Development of the 2009-10 IEP[8]

#### a. Preparation of the Draft IEP

The present dispute arises from the development of M.D.'s IEP for the 2009-10 school year, his ninth grade. On March 25, 2009, the District requested that the Parents execute a release to obtain M.D.'s Kildonan academic records and testing information in advance of the CSE annual review meeting, where M.D.'s 2009-10 IEP would be discussed and developed. P Ex. C. The Parents responded on March 29, 2009, enclosing an executed release and a copy of Dr. Mattis' 2007 neuropsychological evaluation. P Exs. A, B.

By letter dated April 13, 2009, a copy of M.D.'s draft 2009-10 IEP (hereinafter "Draft IEP") was sent to the Parents in advance of the CSE meeting, which was scheduled for April 21, 2009. SD Ex. 10 at 1-10. The draft IEP was developed by Frank Zito, the school psychologist; Kate Hines, the High School Special Education Coordinator; Beth Catalano, a ninth grade guidance counselor; and Kelly Doyle, a ninth grade special education teacher. IHO Tr. 74-78. To prepare the draft IEP, the District reviewed M.D.'s 2008-09 IEP, Dr. Mattis' 2007 evaluation, and the results of a 2009 psychoeducational re-evaluation performed by Mr. Zito (discussed below).[9] SD Ex. 10 at 7; IHO Tr. 524-26, 530. However, the District had not obtained, and therefore did not incorporate, M.D.'s current Kildonan academic records. IHO Tr. 194-96.

---

[8] Only those aspects of M.D.'s 2009-10 IEP that are in dispute will be discussed herein. All other elements of the IEP are assumed to be uncontested and not before the Court.

In the interest of clarity, the Court will refer to testimony from both the CSE meeting and the impartial hearing to set forth the development of M.D.'s draft IEP and the sequence of events at the CSE annual review meeting on April 21, 2009.

[9] Although Mr. Zito's psychoeducational re-evaluation report was not completed until April 15, 2009, Mr. Zito had completed M.D.'s testing by April 13, 2009 and incorporated the testing results into the draft IEP to "formulat[e] parts of the present levels of performance, the maps, looking at where the standardized test results get included, how the scores reflect on his academic achievement." IHO Tr. 527-28; SD Ex. 7 at 1.

As relevant to this appeal, the draft IEP continued M.D.'s classification as a student with a learning disability and recommended placement at Beacon High School with the following special education programs and services:  (1) an ICT class with a 12:1 ratio for English, science and social studies; (2) a non-integrated math class; (3) resource room services for reading and writing skills in a 3:1 non-integrated setting; (4) resource room services for organizational skills in a 5:1 non-integrated setting; and (5) individual counseling to address "anxiety management and transitional issues that [M.D.] may experience in his initial freshman year at the high school."  SD Ex. 10 at 2-3.  The draft IEP noted that "[i]nstruction should be presented in a multisensory fashion."  *Id*. at 5.

The draft IEP also included the following program modifications, accommodations and supplementary services/devices:  (1) modified homework assignments and the opportunity to begin homework during resource room; (2) refocus and redirection of M.D. to keep him focused on the task at hand; (3) checks to ensure M.D.'s understanding of academic material presented; (4) waiver of spelling requirements; (5) visual assistance through the use of a "graphic organizer," especially for writing tasks; (6) access to a word processor as need throughout the day; (7) preferential seating, noting that M.D. should be seated "close to instruction and away from distractions;" (8) class notes provided upon M.D.'s request; (9) use of a "routing sheet;" and (10) special testing accommodations.  *Id.* at 3-4.  The draft IEP removed M.D.'s exemption from a second language requirement.  *Id.* at 4.  It also noted the creation of a Supportive Behavior Plan, which would be developed after M.D.'s placement in the District "to address [M.D.'s] low self[-]esteem, self[-]management skills and organization."  *Id.* at 3.

---

Additionally, the draft IEP notes Mr. Zito's Kildonan classroom observation, conducted on April 14, 2009, as a documentary source for the draft document.  SD Ex. 10 at 7.  However, Mr. Zito's observation was obviously conducted after the preparation of the draft IEP, which was sent to the Parents on April 13, 2009.

Additionally, the draft IEP included regular interactions between the District and M.D.'s Parents.  First, M.D.'s teachers would provide the Parents with weekly email communications discussing M.D.'s progress.  *Id*. at 3.  Second, school personnel would meet with the Parents after the first five weeks of school, and then on a quarterly basis, to coordinate efforts regarding M.D.'s transition to high school.  *Id*.

The Court notes that the services recommended for M.D. in the draft IEP included multisensory instruction, special seating, a word processor, and regular interaction between the school and the Parents as recommended in Dr. Mattis' 2007 neuropsychological report.  SD Ex. 4 at 10.

Finally, the draft IEP listed fifteen annual goals which included:  two social, emotional, and behavioral goals related to M.D.'s needs in coping and requesting assistance; three study skills goals related to M.D.'s needs in organization, attention, and self-advocacy; three reading goals related to M.D.'s needs in comprehension and vocabulary; three writing goals related to M.D.'s needs in editing, structure, organization and punctuation; and four math goals related to M.D.'s needs with calculations, fractions and multi-step problems.  SD Ex. 10 at 7-10.  Each goal contained specific evaluation criteria, evaluation procedures and an evaluation schedule.  *Id.* However, there were no specific goals related to spelling skills.  IHO Tr. 787.

The goals in the draft IEP had been developed by Mr. Zito, Ms. Hines and Ms. Doyle. Mr. Zito drafted the social, emotional and behavior goals with significant reliance on Dr. Mattis' evaluation and he also reviewed M.D.'s records and performance from elementary school.  *Id.* 544, 546-47, 556-57.  Ms. Hines and Ms. Doyle worked together to draft M.D.'s goals in study skills, reading, writing, and math and they relied mainly upon M.D.'s 2008-09 IEP and Dr. Mattis' evaluation.  *Id.* 642-44, 706-07, 729-30.  Ms. Doyle noted that some of the goals were

10

taken from a pre-drafted computer database.  *Id.* 731-33.  Further, Ms. Hines and Ms. Doyle

testified that they did not have M.D.'s current Kildonan academic records, but nevertheless they

felt that they possessed sufficient information to draft goals that were suited to M.D.'s individual

needs.  *Id.* 662-66, 670, 721-23, 759.

i.   *Mr. Zito's Psychoeducational Re-evaluation and Kildonan Visit*

On April 15, 2009, Mr. Zito presented the report of his psychoeducational re-evaluation

of M.D. to determine his individual needs, educational progress, ability to benefit from regular

education programs, and continued eligibility for special education and related services.  *Id.* 477;

SD Ex. 7 at 1.  Mr. Zito was familiar with M.D. as he had conducted several evaluations of M.D.

since the 2005-06 school year.  *See* IHO Tr. 475-76.  Mr. Zito conducted cognitive functioning

testing using the Weschler Abbreviated Scale of Intelligence ("WASI"), which yielded scores for

M.D. that fell within the low average range.  He assessed M.D.'s academic functioning using the

Weschler Individualized Achievement Test-Second Edition ("WIAT-II"), which yielded scores

in the low average range for reading, borderline range for math and extremely low range for

written language.  SD Ex. 7 at 4-5. [10]

As part of his re-evaluation, Mr. Zito had visited Kildonan on April 14, 2009 and

observed M.D. over a two hour period.  SD Ex. 6 at 1.  He observed M.D. during a 1:1 tutoring

session with his reading instructor and noted that M.D. "was focused and engaged in all of the

presented activities."  SD Ex. 7 at 3; CSE Tr. 17.  However, during the oral reading activity, Mr.

Zito opined that M.D. "started to fatigue over time when he was reading aloud . . . ."  CSE Tr.

17.  Mr. Zito also spoke to the reading instructor about M.D.'s progress.  IHO Tr. 501-03.  Mr.

---

[10] *See infra* n. 9 for a discussion of the testing portion of Mr. Zito's report, which was finalized prior to April 15, 2009.

Zito then observed M.D. in his physical science class, with approximately eight students, and conversed with M.D.'s physical science teacher who said that M.D. took his school performance "very seriously," and described him as "conscientious" and hard-working.  *Id.* 502, 566; SD Ex. at 6; SD Ex. 7 at 3.[11]

In conducting the psychoeducational re-evaluation, Mr. Zito did not perform a "full battery" of tests on M.D. since he had reviewed Dr. Mattis' "comprehensive" 2007 neuropsychological evaluation and the results of previous Weschler Intelligence Scale for Children ("WISC") testing.  CSE Tr. 18; SD Ex. 7 at 2.  Moreover, Mr. Zito reviewed his own past assessment of M.D. in June 2006, had the Parents complete a social history update and a ratings scale to assess M.D.'s executive functioning, and examined reports from Frances Lafferty, Ph.D., performed in November 2004, and Angela Zappata, performed in January 2003. IHO Tr. 477, 531-32; SD Ex. 7 at 2, 5.  Mr. Zito did not have written records from Kildonan for the 2008-09 school year and he was not familiar with the Kildonan curriculum when preparing M.D.'s evaluation.  *See* IHO Tr. 539-40, 543.

In his final report of April 15, 2009, Mr. Zito ultimately concluded that M.D.'s difficulties with organization and problem analysis appeared to negatively affect all academic areas.  SD Ex. 7 at 7.  As a result, Mr. Zito recommended:  (1) special education support to develop reading and writing strategies and to improve M.D.'s study skills; (2) multisensory instruction; (3) preferential seating to help M.D. sustain attention and to persist with tasks; (4)

---

[11] Mr. Zito's observation report indicated that M.D. did not demonstrate difficulties following classroom procedures, was able to work independently and sought teacher assistance in an appropriate manner.  SD Ex. 6 at 1. Academically, M.D. did not exhibit difficulties with visual perceptual motor tasks or expressive language, could follow verbal directions, exhibited appropriate responses in group discussions and had adequate knowledge in the observed academic tasks.  *Id.*

access to a word processor as needed throughout the day and for lengthy assignments; and (4)

use of visual and graphic organizers to externally structure and organize his writing. *Id*. at 7-8.

ii. *Mr. Mulhern's Kildonan Visit*

On April 20, 2009, after the draft IEP was completed, Frank Mulhern, District Director of

Pupil Personnel Services,[12] visited Kildonan and watched M.D. in his "one-to-one observation."

IHO Tr. 245-46.  Although the visit was previously scheduled, Mr. Mulhern was unable to

consult with Kildonan's Academic Dean, Dr. Robert Lane, at that time.  *Id*. 65.

b.  <u>The CSE Meeting and the Development of the Final IEP</u>

On April 21, 2009, the CSE was convened to develop M.D.'s IEP for the 2009-10 school

year, his freshman year of high school.  CSE Tr. 2.  As of that date, the District had not obtained

M.D.'s current Kildonan academic records.  IHO Tr. 196-97.[13]  There were nine participants in

the CSE meeting:  Mr. Mulhern, who served as the CSE chairperson; Mr. Zito, the school

psychologist; Kate Hines, the High School Special Education Coordinator; Beth Catalano, a

ninth grade guidance counselor; Kelly Doyle, a ninth grade special education teacher; Atar Near,

a high school regular education teacher; the Parents; and Dr. Robert Lane, Kildonan's Academic

---

[12] Mr. Mulhern is also responsible for the development, implementation and supervision of both IEP and Section 504 accommodation plans.  IHO Tr. 62-63.  He has 38 years of experience in the areas of child welfare and education and is certified by the State as a Special Education Teacher.  *Id*. 58-59.

[13] Although the Parents provided the District with an authorization to obtain M.D.'s academic records, the District did not send out the request due to an administrative "glitch."  IHO Tr. 232.  However, when Mr. Mulhern was asked if he should have delayed the April 21, 2009 CSE meeting due to insufficient information on M.D.'s current status, he responded that he felt he had sufficient information because "I did get to meet his one-to-one instructor, I did get to meet a teacher in the library, I did get to see the program, I was already aware of other reports on M.[D.] relative to Dr. Mattis' report, Frank Zito's observation which had occurred, Frank Zito's 2009 psych. ed. eval.  So I had on top of that Dr. Lane's participation in the meeting the next day to which we could ask the questions we needed to ask relative to M.[D.]'s current performance at Kildonan school."  *Id*. 253-55.  However, Mr. Mulhern acknowledged that he was "uneasy" about proceeding with M.D.'s annual IEP review as the District had not sought any academic records for four years.  *Id*. 255, 259.

13

Dean, who participated telephonically for approximately 20 minutes.  SD Ex. 3 at 6; IHO Tr. 80-81, 668.

### i.  *Mr. Near As The CSE's Regular Education Teacher*

At the time of the CSE meeting, Mr. Near, the designated regular education teacher at the meeting, was not teaching ninth grade, the grade in which M.D. would be placed, and it had not been determined whether he would teach ninth grade during the 2009-10 school year.  IHO Tr. 151-52, 910.[14]  Mr. Near normally taught tenth, eleventh and twelfth grade classes.  *Id.* 83.

Nevertheless, Mr. Mulhern believed that Mr. Near was particularly valuable to the CSE as he was "highly familiar with special education programming . . . [and the] ninth grade curriculum and . . . a very understandable and creative person when it comes to curriculum for students who are coming in with special needs."  *Id.* 83.  Mr. Mulhern added that Mr. Near had previously taught ICT classes and was familiar with the "bridge work" many special education students require when entering integrated classes.  *Id.* 85, 909-10.

### ii.  *Dr. Lane's Update on M.D.'s Progress at Kildonan*

Dr. Lane participated in the meeting by telephone.  At the beginning of the meeting, Dr. Lane stated that M.D. was "doing quite well" at Kildonan and had "an A and three B's."  CSE Tr. 7.  Dr. Lane then recounted information provided by M.D.'s math and language training teachers.  In math, M.D. was able to work through some basic operations without the use of a calculator and he was learning to slow down when solving math problems and check the accuracy of his answers.  *Id.* 8-9.  With respect to reading, while M.D. had made progress, he still needed to work on reading fluency and comprehension.  Dr. Lane noted that "reading out

---

[14] According to the testimony of Ms. Hines before the IHO, Mr. Near would not have been assigned to teach M.D. during the 2009-10 school year, however, she acknowledged that at the time of the CSE meeting, Mr. Near's class assignments had not yet been determined.  IHO Tr. 909-10.

loud [] still remains difficult for him, particularly . . . retaining or maintaining any kind of stamina while he's reading, as well as comprehension of what he's reading because of how much energy he is still putting forth in the fluency piece." *Id.* 10.  Similarly, Dr. Lane noted that M.D. needed to work on his writing skills. *Id.* 10-11, 15.  Finally, Dr. Lane concluded that much of M.D.'s progress was attributable to "being in the small class sizes with . . . teachers who . . . are using Orton-Gillingham across the curriculum." *Id.* 14.

> iii.   *Evaluation of the District's Recommended Classes and Class Sizes*

When discussing the District's recommended classes for M.D., Mr. Mulhern noted that both Dr. Lane and Dr. Mattis had recommended a class enrollment maximum of eight to ten students.  IHO Tr. 105.  Additionally, aware of Kildonan's small classes, Mr. Mulhern opined that M.D. would initially experience transitional issues at Beacon High School, but he did not consider these issues to be insurmountable. *Id.* 347.  He based this opinion on what the District knew about M.D. as well as the educational profiles of similar students who had participated in integrated classes. *Id.* 347, 413.

Mr. Mulhern next addressed M.D.'s proposed non-integrated math class which would be limited to students with IEPs and would have a 15:1+1 ratio, meaning a maximum of 15 students with a teacher and a paraprofessional. *Id.* 107.  However, the math class in which M.D. would be placed was to have an actual enrollment of eight students and therefore, given the presence of both teachers, M.D. would receive math services on a 4:1 ratio. *Id.* 107.

Mr. Mulhern also addressed class size in the context of M.D.'s general education ICT classes, which had anywhere from 22 to 25 students, a full-time general education teacher, and a full-time special education teacher. *Id.* 107.  Mr. Mulhern explained that the special education teacher would work mainly with the IEP students in the class, whose enrollment would be

15

capped at twelve. *Id.* 107-08, 341. Thus, he explained, M.D. would receive ICT instruction in an 11:1 to 12.5:1 ratio. *Id.* 107, 111. Mr. Mulhern added that M.D. would receive the necessary support in his ICT classes because the classes include "a teacher . . . whose primary job is to know what the accommodations are so M.[D.] can function in a general ed. setting." *Id.* 111. Furthermore, he testified that the ICT classrooms were equipped with multi-media technology and included leveled curricula, enabling the presentation of modified material to the special education students. *Id.* 108-112. Nevertheless, Mr. Mulhern acknowledged that the District had not observed M.D. in a large classroom setting. *Id.* 417.

As a secondary support, Mr. Mulhern explained that M.D. would participate in a daily literacy-based resource room with a 3-to-1 ratio in which pre-teaching, re-teaching and reading for mastery would be stressed. *Id.* 387-88. The District would also assign Ms. Doyle, the ninth grade special education teacher present at the CSE meeting, as both M.D.'s ICT English special education teacher and as his literary-based resource room teacher to reinforce M.D.'s specific needs with reading and writing. *Id.* 654-657. Finally, M.D. would attend a second resource room with a 5-to-1 ratio in which predicate skills for executive functioning would be established and reinforced. *Id.* 389.

Mr. Zito echoed Mr. Mulhern's assertion that M.D. would perform well in an ICT class with 25 students. When asked to explain his position, Mr. Zito said that the ICT class would be suitable to address M.D.'s focus and attention needs as well as his educational needs. *Id.* 514. He based his belief not only on M.D.'s performance, but on his experience with similar students: "[T]here are a variety of students, I believe . . . within the public school setting with disabilities not unlike M.[D.]'s that are functioning quite well in the integrated model." *Id.* 514.

Furthermore, Mr. Zito added, "I believe that . . . his needs can be met within that setting, that that is – it's the least restrictive environment he can be successful in, that's for sure." *Id.* 515.

Consistent with the other District members present at the CSE meeting, Ms. Hines, the High School Special Education Coordinator, considered an ICT classroom to be appropriate for M.D. *Id.* 648-49. She based her opinion on the inherent structure of the ICT classes in which a content teacher and a special educator work together to present materials. Among other things, Ms. Hines described a classroom in which material was presented through multiple modalities with frequent hands-on opportunities, small group work, easy to read texts, and repetition. *Id.* 649.

Finally, Ms. Doyle, M.D.'s intended ICT English special education teacher and literary-based resource room teacher, described her previous work at Kildonan, explained that she would work on reading strategies and speaking connections with M.D., and stated that she was familiar with Orton-Gillingham instruction methodology. CSE Tr. 29. Ms. Doyle also testified that M.D. would be an "average student" in her English class based on his reading composite scores, which fell in the average range with the rest of the students in the class. IHO Tr. 717. Finally, she explained how the class would address M.D.'s needs in language arts. *Id.*

In stark contrast to the District's position, the Parents informed the District that they did not believe their son could succeed in an ICT classroom with 22 to 25 students. CSE Tr. 36-53. M.D.'s mother stated, "[A]s conscientious parents, we couldn't allow him to attend this program . . . ." *Id.* 37. The Parents specifically asked the CSE committee if they had reviewed Dr. Mattis' 2007 report and whether they disagreed with Dr. Mattis' findings and his recommendation for small classes. *Id.* 41-44.

17

In response to the Parents' disapproval of the draft IEP and the proposed ICT classes, the District asked the Parents what type of IEP they envisioned for their son.  *Id*. 41.  M.D.'s mother responded, "[W]here [M.D.] is making educational emotional progress, I would like to see my son [] be able to continue along those same lines."  *Id*. 41.  Then M.D.'s father added:

> We would like to see [M.D.] continue to make academic gains and successes as he currently is  . . .  Well, the setting that he has is bringing him educational progress right now, and educational benefit.  So I don't have a specific answer, but if the [D]istrict knows of a program that's close by that they can give that we feel would do this, I would be more than willing to see it or look at it.

*Id*. 44.

### iv.  *Terminating M.D.'s Exemption From a Second Language Requirement*

The CSE discussed M.D.'s second language requirement.  It is not disputed that Mr. Mulhern unilaterally determined that M.D. would not be exempted from a second language requirement even though he recognized that M.D. is a student with a reading disability who struggles with language in general.  IHO Tr. 274, 276-79.  Mr. Mulhern removed the exemption because he did not want to prematurely foreclose M.D.'s opportunity to obtain a Regents diploma, as opposed to simply a local diploma.  He explained that M.D. could satisfy the second language requirement by taking on-line American Sign Language courses or additional academic courses that would satisfy the Regents requirements.  CSE Tr. 25, 33; IHO Tr. 277, 281-82.[15]

### v.  *Goals and References to Specific Peer-Reviewed Research*

Finally, there is no dispute that the goals contained in the IEP were not discussed during the CSE meeting, or that the IEP made no reference to specific reading programs based upon empirically researched data.  IHO Tr. 297, 320-27.

---

[15] The District did not offer an American Sign Language course during the 2009-10 school year.  IHO Tr. 278.

vi.   *Events Post-CSE Meeting and the Final IEP*

On April 24, 2009, the Parents sent correspondence to Mr. Mulhern stating that they had "shared with the [CSE] committee, *in length*, [their] serious concerns and reasons why [they] object[ed]" to the District's recommended program, but added that they "would welcome any other program suggestions that would *duplicate* what [M.D.] is currently receiving."  SD Ex. 11 at 1 (emphasis added).  On May 4, 2009, the Parents visited Beacon High School and observed M.D.'s proposed history class and resource rooms.  IHO Tr. 1368-72.

On June 22, 2009, the District sent the Parents the final version of the IEP ("Final IEP"), dated April 21, 2009.  SD Ex. 12 at 1; SD Ex. 3 at 1.  The final IEP reflected only minimal changes to the draft version.  Consistent with the draft IEP, the final report recommended continuation of M.D.'s classification as a student with a learning disability and the following special education program at Beacon High School:  (1) ICT classes with a 12:1 ratio for English, science and social studies; (2) a 15:1+1 non-integrated math class;[16] (3) resource room services in a 3:1 non-integrated setting for reading and writing skills; (4) resource room services in a 5:1 non-integrated setting for organizational skills; and (5) individual counseling to address "anxiety management and transitional issues that [M.D.] may experience in his initial freshman year at the high school."  *Compare* SD Ex. 3 at 1-2, *with* SD Ex. 10 at 2-4; *see generally* IHO Tr. 107.

As relevant to this appeal, the program modifications, accommodations, supplementary services/devices and communication with the Parents included in the final IEP were identical to those proposed in the draft IEP.  SD Ex. 10 at 3-4.  Similarly, the final IEP listed fifteen annual

---

[16] Although the draft IEP only noted that M.D. would be placed in a non-integrated math class, the final version reflected that math would be provided in non-integrated class with a 15:1+1 ratio.

goals, which were identical to those in the draft IEP. *Compare* SD Ex. 3 at 7-9, *with* SD Ex. 10 at 7-10; SRO Dec. at 22 n. 27.[17]

The final IEP also referenced the Parents' comments at the CSE meeting.  Specifically, the IEP stated that the Parents believed M.D. had benefited from Kildonan's small class sizes and use of Orton-Gillingham instruction.  SD Ex. 10 at 6.  Further, the IEP noted the Parents' concern that the transition from Kildonan to Beacon High School would increase M.D.'s anxiety levels and seriously disrupt the progress he had made at Kildonan.  *Id.* at 6-7.

On July 2, 2009, the District notified the Parents about its Freshman Summer Orientation Program which would begin later that month.  SD Ex. 14 at 1.  On July 6, 2009, the Parents informed the District that M.D. would not be attending the Freshman Summer Orientation Program and reiterated their request for the District to "*duplicate* a program, in [D]istrict, like the one [M.D.] is currently receiving and deriving educational benefit from."  SD Ex. 15 at 1 (emphasis added).  Finally, by correspondence dated August 14, 2009, the Parents advised the District that they were rejecting the special education program and related services embodied in the final IEP and intended to re-enroll M.D. at Kildonan for the 2009-10 school year.  The Parents also intended to seek reimbursement from the District for M.D.'s Kildonan tuition.  SD Ex. 13 at 1-3.

---

[17] The goals included:  two social, emotional, and behavioral goals related to M.D.'s needs in coping and requesting assistance; three study skills goals related to M.D.'s needs in organization, attention, and self-advocacy; three reading goals related to M.D.'s needs in comprehension and vocabulary; three writing goals related to M.D.'s needs in editing, structure, organization and punctuation; and four math goals related to M.D.'s needs with calculations, fractions and multi-step problems.  SD Ex. 3 at 7-9.  Each goal contained specific evaluation criteria, evaluation procedures and an evaluation schedule.  *Id.*  As in the draft IEP, the final version did not contain a goal specifically related to spelling skills.  *Id.*

### C.  IHO Hearing and Decision

On March 16, 2010, the Parents filed an amended due process complaint notice[18] alleging that:  (1) the CSE predetermined M.D.'s final IEP, issuing an IEP essentially duplicative of M.D.'s 2008-09 IEP; (2) the CSE failed to obtain M.D.'s current educational records from Kildonan, which resulted in the IEP being developed without consideration of M.D.'s current levels of performance; (3) the IEP did not reference peer-reviewed research or identify peer-reviewed instructional protocol; (4) the CSE unilaterally removed M.D.'s exemption from taking a second language; (5) the CSE failed to discuss M.D.'s annual goals and objectives; (6) the study skills, reading, and transitional goals set forth in the IEP were inadequate for M.D.'s needs; (7) the CSE was improperly constituted, as it did not include a regular education teacher who might be responsible for implementing M.D.'s IEP in the ninth grade; (8) the aforementioned deficiencies rendered the final IEP a nullity, and deprived M.D. of a FAPE; and (9) M.D. progressed at Kildonan, which the Parents maintained "offer[ed] him a program that [met] his needs and [enabled] him to benefit from an appropriate education."  SD Ex. 1 at 6-9.  The Parents sought an IHO order reimbursing them for M.D.'s tuition at Kildonan for the 2009-10 school year.  SD Ex. 1 at 10.

The IHO conducted a nine-day hearing between April 19, 2010 and September 28, 2010. IHO Dec. at 1.  Seven witnesses testified, over 25 documents were received in evidence and both parties submitted post-hearing briefs.  *Id.* at 1-41.

As relevant to this appeal, and not already discussed above, Dr. Mattis testified at the IHO hearing as to his disagreement with the District's final IEP.  First, Dr. Mattis opined that the

---

[18] The SRO's decision notes, and the Court's independent review confirms, that the hearing record does not contain a copy of the original due process complaint notice.  SRO Dec. at 12 n. 18.

proposed math class was contraindicated as M.D. had an average intelligence (full-scale IQ of 100 based on his 2007 WISC-IV testing) and "half [of the students in the math class] would be considered [to have] borderline intellectual abilities," with IQ scores of 72, 73, and 75.  IHO Tr. 1238-40; P Ex. I at 5.  However, Mr. Zito's 2009 testing indicated that M.D. had a full-scale IQ of 83 on the WASI, a score reflecting low-average cognitive function.  SD Ex. 7 at 3.  Dr. Mattis reconciled this discrepancy in IQ scores by noting that the WASI test did not include sub-tests of working memory or processing speed, areas of strength for M.D. which contributed to an overall higher full-scale IQ.  IHO Tr. 1258-1261; *see also* IHO Dec. at 18.

Second, Dr. Mattis opined that an integrated class with a maximum enrollment of 25 students would be "overwhelming" for M.D.  IHO Tr. 1283.  Also, he doubted that the proposed program modifications and supplementary services could be achieved in the large classroom setting.  *Id.* 1352-53.  Dr. Mattis explained that M.D. had a "number of difficulties but the limiting factors would be his attentional difficulties and his language problems.  And there's just too many kids whose behaviors, comments . . . that would be inhibitive in order for him to focus upon whatever lessons are being given."  *Id.* 1283-84; *see also id.* 1295-97 (similar).  However, Dr. Mattis acknowledged that he had not observed any of the District's proposed classes.  *Id.* 1314-15, 1330.  Furthermore, Dr. Mattis had not communicated with anyone at Kildonan regarding the services that the school provided M.D. for the 2009-10 school year nor did he know the specific sizes of M.D.'s classes for that year.  *Id.* 1301-03.

Mr. Mulhern was also called as a witness.  With respect to M.D.'s present levels of performance, Mr. Mulhern testified that he thought Dr. Lane would be able to provide this information at the CSE meeting.  *Id.* 304.  Mr. Mulhern also opined that the draft IEP did not reference specific reading programs based upon empirically researched data because including a

specific methodology would unnecessarily restrict the ability of District personnel to tailor their educational methods to the needs of M.D. *Id*. 320-27.

   As to the goals listed in the draft IEP, both parties testified that the CSE did not discuss M.D.'s goals during the IEP review meeting. *See generally id*. 297. However, Ms. Hines testified that after hearing Dr. Lane's progress update, she felt comfortable with M.D.'s drafted goals. *Id*. 670. She noted that there is also a 30-day review for students transferring into the District and IEP modifications can be made at that time. *Id*. 643.

   On December 6, 2010, the IHO issued a decision holding that the District had failed to provide M.D. with a FAPE. IHO Dec. at 25-34. According to the IHO, the deprivation of a FAPE arose from a combination of procedural and substantive violations. First, the CSE did not include a general education teacher who would be assigned to work with M.D., which was a procedural violation of State regulations. *Id.* at 27-28. The IHO held that the presence of an adequate general education teacher was "essential given the CSE's recommendation of an integrated program." *Id.* at 27. As a second procedural violation, the CSE had impermissibly predetermined M.D.'s goals, as the CSE had failed to discuss his goals and thus deprived the Parents "of an opportunity to meaningfully discuss the student's needs, and those services required to meet those needs." *Id.* at 29.[19] In connection with this claim, the IHO found that M.D.'s goals had been developed without information on his current levels of performance. *Id.* at 29-30.

---

[19] The Court notes that the CSE's failure to discuss M.D.'s goals can result in two distinct procedural violations: (1) the goals could have been finalized, or predetermined, by the District in advance of the CSE meeting, in violation of 34 C.F.R. Part 300, App'x A, Question 32 (stating that it is impermissible for an agency to finalize an IEP before the beginning of an IEP meeting); and (2) the Parents can be deprived of an adequate opportunity to participate in their child's IEP, as required by 20 U.S.C. § 1415(b)(1). Here, the IHO conflated these two potential procedural violations and concluded that the failure to discuss M.D.'s goals resulted in predetermination because the Parents had been deprived of an opportunity to participate in the development of M.D.'s IEP.

With respect to substantive violations, the IHO concluded that the record did not support the District's position that M.D. could function in ICT classes of 22 to 25 students. *Id.* at 33. Specifically, the IHO stated that the District's description of the classes was "disingenuously described almost exclusively as [] 'small class[es].'" *Id.* at 31-34. Additionally, according to the IHO, the hearing record lacked sufficiently specific evidence demonstrating either how the ICT classes would address M.D.'s language-based learning disability, his severe dysnomia and executive function and expressive writing deficits, or how the two daily resource room classes would have compensated for M.D.'s educational and cognitive deficits. *Id.* at 33.

The IHO also found that neither the CSE's failure to incorporate references to specific peer-reviewed research into the IEP nor the District's unilateral removal of M.D.'s second language exemption, in and of themselves, constituted denials of a FAPE. Further, the CSE did not impermissibly predetermine M.D.'s programming recommendations. *Id.* at 26, 28.

Finally, the IHO held that the Parents met their burden of proving that Kildonan was an appropriate placement for M.D. for the 2009-10 school year and that equitable considerations did not preclude an award of full tuition reimbursement. *Id.* at 35.

**D.  SRO's Decision**

The District appealed the IHO's decision to the SRO and on March 7, 2011, the SRO issued his decision. The SRO first noted that the parties did not appeal the following IHO determinations: that (1) the lack of references to specific peer-reviewed research in the final IEP did not, by itself, deprive M.D. of a FAPE; (2) the removal of M.D.'s second language exemption did not, by itself, deprive M.D. of a FAPE; (3) equitable considerations did not bar the Parents' claim for tuition reimbursement; and (4) the CSE did not predetermine M.D.'s final IEP. SRO Dec. at 14. Thus, the SRO considered these aspects of the IHO's decision final and

24

binding on the parties.  SRO Dec. at 14; *see also* 34 C.F.R. § 300.514(a); 8 N.Y.C.R.R. 200.5(j)(5)(v).

However, the Court notes that the Parents did in fact appeal the issue of predetermination to the SRO in their Verified Answer and, moreover, the IHO did find that while the District's programming recommendations were not impermissibly predetermined, the failure to discuss M.D.'s goals with the Parents did amount to a procedural violation which deprived the Parents of an opportunity to meaningfully discuss M.D.'s needs.  Verified Answer ¶ 4;[20] IHO Dec. at 28-29.  Thus, only the first three issues are properly excluded from the Court's consideration.

The SRO overruled the IHO decision in its entirety and held that the District had in fact offered M.D. a FAPE for 2009-10.  SRO Dec. at 24.  First, the SRO noted that although he was not persuaded that the attendance of Mr. Near, who would not have been M.D.'s general education teacher in the ninth grade,[21] comported with the technical requirements of federal and state regulations, the hearing record did not demonstrate that the failure to include an appropriate regular education teacher at the CSE meeting impeded M.D.'s right to a FAPE.  Furthermore, the Parents had not alleged any specific harm caused by this procedural error.  *Id.* at 17.  The Parents had been given the opportunity to "ask questions to which the other CSE members responded, and express their opinions as to the appropriateness of the recommended program for their son, and, during the impartial hearing, expressed satisfaction with the level of time and effort

---

[20] The Parents Verified Answer to the SRO "affirmatively assert[ed] that the program recommended [by] Respondent for M.D.'s 2009/2010 school year was predetermined prior to the annual review conducted on April 21, 2009.  Verified Answer ¶ 4; *see also id.* ¶¶ 5, 7-8.

[21] The SRO relied on Ms. Hines' testimony before the IHO that Mr. Near would not have been assigned to teach M.D. during the 2009-10 school year.  SRO Dec. at 17.  However, the Court notes that Ms. Hines also testified before the IHO that at the time of the CSE meeting, Mr. Near's class assignments had not yet been determined.  IHO Tr. 909-10.

accorded to them by the CSE . . . ."  *Id.*  However, the SRO did caution the District "to ensure that it complies with the regulatory requirements pertaining to the participation of the appropriate regular education teacher member at CSE meetings."  *Id*. at 18.

Second, according to the SRO, the hearing record demonstrated that the IEP accurately reflected M.D.'s present levels of performance and was based on multiple documentary sources, including Dr. Mattis' 2007 neuropsychological evaluation, the 2008-09 IEP, March 2008 academic achievement testing, an August 13, 2008 health examination record, Mr. Zito's April 14, 2009 Kildonan classroom observation and April 15, 2009 psychoeducational evaluation, the triennial social history report completed by the Parents, and the information provided by Dr. Lane, Kildonan's Academic Dean, during the CSE meeting.  *Id*. at 21.  The "[D]istrict witnesses maintained that the CSE possessed sufficient evaluative information from the telephonic participation of Kildonan's academic dean relative to the student's present levels of performance to proceed with the student's annual review."  *Id.*

Third, the SRO found that the CSE's failure to discuss M.D.'s goals did not, by itself, render the goals deficient, considering that the Parents received the draft IEP in advance of the meeting and were afforded the opportunity to "meaningfully participate in the review process." *Id*. at 23.  The SRO concluded that the goals were objectively measurable and consistent with M.D.'s abilities and needs as described in the various documentary sources and testimony provided by Dr. Lane.  *Id.*  The goals were also designed to allow M.D. to make progress in a general education curriculum.  *Id.*

The SRO, *sua sponte*, addressed the lack of spelling goals in the IEP and faulted the District for not including such goals "despite the fact that the [D]istrict resource room teacher acknowledged the student's 'pronounced deficit' in spelling during the impartial hearing, which

described the student's spelling skills as 'borderline' and 'well below grade level expectations.'" *Id*. at 23 (citation omitted).  However, the SRO believed that the lack of spelling goals could have been addressed during the 30-day IEP review meeting or during a quarterly meeting with the Parents.  *Id*.

With respect to the District's recommended ICT classroom placement, the SRO held that the suggested placement would have addressed M.D.'s needs in the least restrictive environment and that the 2009-10 IEP was reasonably calculated to enable the student to receive educational benefits.  *Id*. at 24-25.[22]  The SRO cited the testimony of Ms. Hines, Ms. Doyle, and Mr. Mulhern as support for his conclusion.  *Id*. at 23-24.  The SRO also discussed that the CSE was required to consider private evaluation reports, but it was not required to follow their recommendations.  *Id*. at 18 (citing *T.S. v. Bd. of Educ.,* 10 F.3d 87, 89-90 (2d Cir. 1993)).

Having found that the District offered M.D. a FAPE for the 2009-10 school year, the SRO declined to evaluate whether Kildonan was an appropriate private school placement.  *Id*. at 25.  Thus, the SRO annulled the IHO's determination that the District was required to reimburse the Parents for M.D.'s Kildonan tuition.  *Id*.

On June 8, 2011, the Plaintiffs commenced the present action to appeal the SRO's decision.  Doc. 1.  On February 21, 2012, the parties made the present motions for summary judgment.  Docs. 9, 11.  The Plaintiffs assert that the SRO's decision below was both procedurally and substantively improper.  The Defendants contend that the SRO's decision was correct and should be affirmed.

---

[22] The SRO also found that the recommended non-integrated math class and resource room supports were reasonably calculated to enable M.D. to receive educational benefits.  SRO Dec. at 24.

### III. Discussion

### A.  Standard of Review

Upon an aggrieved party's appeal of the SRO's decision to the federal district court, the court must review the entirety of the administrative record in addition to supplemental evidence upon either party's request.  20 U.S.C. § 1415(i)(2)(c).  Though IDEA appeals tend to come before the district court as motions for summary judgment, *see e.g. Viola v. Arlington Cent. Sch. Dist.*, 414 F. Supp. 2d 366, 377 (S.D.N.Y. 2006), the existence of a genuine issue of material fact does not necessarily result in denial of the motion.  *J.R. v. Bd. of Educ. of the City of Rye Sch. Dist.*, 345 F. Supp. 2d 386, 394 (S.D.N.Y. 2004).  Rather, a motion for summary judgment in the IDEA context is more akin to an appeal from an administrative determination.  *M.H.*, 685 F.3d at 226 (citing *Lillbask ex rel. Mauclaire v. State of Conn. Dep't of Educ.*, 397 F.3d 77, 83 n.3 (2d Cir. 2005)).

A district court reviewing a claim for private school tuition reimbursement under the IDEA must carry out either a two or three-step process.  First, the court must ask "whether the state has complied with the procedures set forth in the IDEA."  *Cerra,* 427 F.3d at 192.  Second, the court must determine "whether the IEP developed through the Act's procedures '[is] reasonably calculated to enable the child to receive educational benefits,'" *Id.* (alteration in original) (quoting *Walczak,* 142 F.3d at 129).  If these requirements are met, then the state has complied with its obligations under the IDEA.  *Id.*  However, if these requirements are not met, the court then asks "whether the private schooling obtained by the parents is appropriate to the child's needs." *Id.*

The rulings of the IHO and the SRO are subject to "independent" judicial review, however, a federal court's role in reviewing state educational decisions under the IDEA is

"circumscribed," as the judiciary "generally lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy." *Gagliardo*, 489 F.3d at 112 (citation and internal quotation marks omitted).  Upon independently reviewing the administrative record, the court must make a determination based upon a preponderance of the evidence, which "is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." *Rowley*, 458 U.S. at 206.  Rather, the federal courts must accord "substantial deference" to such findings. *Cerra*, 427 F.3d at 191.  Furthermore, district courts should abstain from making "subjective credibility assessments."  *M.H.*, 685 F.3d at 240 (quoting *Grim v. Rhinebeck Cent. Sch. Dist.*, 346 F.3d 377, 383 (2d Cir. 2003)) (internal quotation marks omitted).

As the Second Circuit has recently articulated, the district court's analysis of the administrative findings below must "hinge on the kinds of considerations that normally determine whether any particular judgment is persuasive, for example whether it was based on substantial greater familiarity with the evidence and the witnesses than the reviewing court." *M.H.*, 685 F.3d at 244.  That being said, the court's conception of whether the administrative findings are persuasive "must also be colored by an acute awareness of institutional competence and role . . . [and] courts are required to remain conscious of these considerations in determining the weight due any particular administrative finding."  *Id.*  District courts should afford more deference to administrative findings as to the substantive adequacy of an IEP, *id.* (citing *Cerra*, 427 F.3d at 195), and to any findings "grounded in thorough and logical reasoning,"  *id.*, than to determinations addressing whether an IEP was developed according to the proper methods.  *Id.* District courts are also advised to show greater deference when "its review is based entirely on

the same evidence as that before the SRO than when the district court has before it additional

evidence that was not considered by the state agency." *Id*.

Finally, "[i]f the SRO's decision conflicts with the earlier decision of the IHO, the IHO's

decision may be afforded diminished weight." *E.A.M. ex rel. E.M.,* 2012 WL 4571794, at *5

(citations and internal quotation marks omitted). Therefore, courts "defer to the final decision of

the state authorities, even where the reviewing authority disagrees with the hearing officer." *Id*.

(citation and internal quotation marks omitted); *see also Matrejek v. Brewster Cent. Sch. Dist.*,

471 F. Supp. 2d 415, 426 (S.D.N.Y. 2007), aff'd, 293 F. App'x 20 (2d Cir. 2008) (deferring to the

SRO's determination because doing otherwise would invite the court to substitute its "own

uniformed judgment for the opinions of persons with far greater expertise without having any

basis to do so . . . ."). However, when the district court correctly finds that the SRO's

determinations are "insufficiently reasoned to merit that deference, and in particular where the

SRO rejects a more thorough and carefully considered decision of an IHO," the court may

"consider the IHO's analysis, which is also informed by greater educational expertise than that of

judges, rather than [] rely[ing] exclusively on its own less informed judgment. *M.H.*, 685 F.3d at

246.

## B. Alleged Procedural Violations

The Parents assert that the IHO correctly determined that a number of procedural

violations, in the aggregate, deprived M.D. of a FAPE. A procedural violation renders an IEP

legally inadequate only when the violation (1) "impeded the child's right to a [FAPE], (2)

"significantly impeded the parents' opportunity to participate in the decisionmaking process

regarding the provision of a [FAPE]," or (3) "caused a deprivation of educational benefits."

*E.A.M. ex rel. E.M.,* 2012 WL 4571794, at *6 (quoting 20 U.S.C. § 1415(f)(3)(E)(ii)); *see also*

*Werner v. Clarkstown Cent. Sch. Dist.*, 363 F. Supp. 2d 656, 659 (S.D.N.Y. 2005) (finding that procedural violations "do not automatically require a finding of a denial of a FAPE.").  However, "procedural inadequacies that individually or cumulatively result in the loss of educational opportunity or seriously infringe on a parent's participation in the creation or formulation of the IEP constitute a denial of a FAPE."  *Werner*, 363 F. Supp. 2d at 659.

Plaintiffs allege that M.D.'s IEP was procedurally inadequate for two reasons.  First, the CSE lacked an appropriate regular education teacher.  Second, the District predetermined M.D.'s goals by failing to discuss this topic at the CSE meeting, which allegedly deprived the Parents of the ability to participate in the CSE process.[23]  To support this claim, the Plaintiffs point out that the goals in the final IEP, which were identical to those in the draft IEP, failed to account for M.D.'s present levels of performance.  The SRO determined that these arguments were without merit.  The Court agrees.

### a.  Lack of An Appropriate General Education Teacher

Under the IDEA, the CSE must include "not less than 1 regular education teacher of such child (if the child is, or may be, participating in the regular education environment)."  20 U.S.C. § 1414(d)(1)(B)(ii); 34 C.F.R. § 300.321(a)(2).  A Notice of Interpretation to the regulations implementing the IDEA provides, "The regular education teacher who serves as a member of a child's IEP team should be a teacher *who is* or *may be* responsible for implementing a portion of the IEP." 34 C.F.R. Part 300, App'x A, Question 26 (emphasis added).  Further, the teacher "shall, to the extent appropriate," participate in the development of the student's IEP, including the determination of appropriate positive behavioral interventions, supports and other strategies,

---

[23] *See* Section II. D. "SRO Decision" for a discussion regarding the Court's ability to consider the Plaintiffs' predetermination challenge.

supplementary aids and services, program modifications, and support for school personnel. 20 U.S.C. § 1414(d)(3)(C); *see also* 34 C.F.R. § 300.324(a)(3); 8 N.Y.C.R.R. 200.3(d).

Here, it is undisputed that a high school regular education teacher—Mr. Near—attended the CSE meeting. Nonetheless, both the SRO and IHO agreed that Mr. Near's attendance at the CSE meeting failed to comport with federal and state regulations because Mr. Near would not have been assigned to teach the ninth grade during the 2009-10 school year. SRO Dec. at 16-17; IHO Dec. at 27. Therefore, the issue before this Court is whether the composition of the CSE was legally inadequate because it did not include a ninth grade regular education teacher who *could have* been responsible for implementing a portion of the IEP.

First, Plaintiffs reiterate the IHO's conclusion that given the District's belief that M.D. could make progress in an ICT class of 25 students, "it was incumbent upon the District to include one of M.D.'s general education teachers, knowledgeable of his ability to manage [a] ninth grade curriculum in large groups of 25 students" and this failure "irrevocably infringed upon the Parents' participation" in the development of M.D.'s IEP. IHO Dec. at 27-28.[24] In support of their argument, the Plaintiffs claim that the SRO's findings "stand[] in sharp contrast with the testimony of M.D.'s mother." Pls.' Mem. L. at 9. For example, when she asked the District's representatives on the CSE how the proposed ICT classes, which had proven ineffective in the past, would work ("[A]re teachers trained any differently, do they use any

---

[24] The IHO stated that "[s]trictly construed, the [IDEA] does not permit the participation of individuals who "might" or "could" have been M.D.'s teacher. IHO Dec. at 27. However, this Court notes that the teacher does not have to be a regular education teacher "*of the student*", *id*. (emphasis in original), but rather can be a teacher "*who is*" or "*may be*" responsible for implementing a portion of the child's IEP. 34 C.F.R. Part 300, App'x A, Question 26 (emphasis added). It is "well-settled that an agency's interpretation of its own regulations is entitled to controlling weight unless it is plainly erroneous or inconsistent with the regulation." *E.A.M. ex rel. E.M.*, 2012 WL 4571794, at *7 (citation and internal quotation marks omitted)

method with the children . . . , what's the difference[?]"), no one responded to her questions. Pls.' Mem. L. at 9 (quoting IHO Tr. 1119).

However, in reversing the IHO's determination, the SRO found that during the CSE meeting, the Parents were allowed to (1) "meaningfully participate in the review process," (2) "ask questions to which the other CSE members responded," and (3) "express their opinions as to the appropriateness of the recommended program for their son."  SRO Dec. at 17 (citing SD Ex. 3 at 6-7; P Ex. D).  Indeed, the SRO found that during the impartial hearing, the Parents "expressed satisfaction with the level of time and effort accorded to them by the CSE in the development of [the final IEP]."  *Id.* (citing IHO Tr. 1418-19).  Therefore, the SRO determined that the evidence did not show that the failure to include a ninth grade regular education teacher significantly impeded the Parents' opportunity to participate in the decisionmaking process and also did not impede M.D.'s right to a FAPE. *Id.* [25]

The Court finds that the administrative record supports the SRO's conclusions.  The transcript of the CSE meeting reveals that M.D.'s parents engaged in extensive dialogue with several CSE members regarding the ICT classroom of up to 25 students, expressed their dissatisfaction with the proposal, discussed Dr. Mattis' recommendation that M.D. be placed in a small classroom setting and provided information regarding M.D.'s progress at Kildonan.  Moreover, after receipt of the final IEP, the Parents sent Mr. Mulhern a letter stating that they

---

[25] The SRO stated that the Parents did not allege "any specific harm caused by the procedural error."  SRO Dec. at 17.  However, in the Plaintiff's Memorandum of Law to the SRO, the Plaintiffs cite to the IHO's determination that the failure to include the requisite general education teacher of M.D. "irrevocably infringed" upon the Parents' participation in the formulation of the final IEP, as M.D. had been recommended to an ICT program.  Pls.' Mem. L. to SRO at 6.  Accordingly, the Plaintiffs have substantially alleged a harm caused by the failure to include a proper regular education teacher on the CSE.

had "shared with the committee, *in length*, [their] serious concerns and reasons why [they] object[ed] to the program offered."  SD Ex. 11 at 1 (emphasis added).

Notably, the CSE transcript also shows that Ms. Doyle, M.D.'s intended special education teacher in the ICT English class, was a member of the CSE and actively participated. CSE Tr. 28-29.  There is no evidence to indicate that Ms. Doyle either lacked knowledge about the ICT setting or could not have provided information regarding such program.  *Cf.  Davis ex rel. C.R. v. Wappingers Cent. Sch. Dist.*, 772 F. Supp. 2d 500, 509 (S.D.N.Y. 2010), aff'd sub nom. *Davis v. Wappingers Cent. Sch. Dist.*, 431 F. App'x 12 (2d Cir. 2011) (affirming the SRO's decision that "without a regular education teacher *or* a special education teacher [who may have worked with the child] present at the meetings, plaintiffs were denied the ability to examine the likely curricular requirements" that the child would face in the eighth grade and the child was therefore denied a FAPE) (emphasis added); *Matrejek*, 471 F. Supp. 2d at 426-27 (same).[26]

Additionally, given the Parents' insistence that the ICT program had failed M.D. in the past, and their expressed desire to have M.D. placed only in a program that would be a

---

[26] Plaintiffs cite to *Matrejek v. Brewster Cent. Sch. Dist.*, 471 F. Supp. 2d 415 (S.D.N.Y. 2007), aff'd, 293 F. App'x 20 (2d Cir. 2008), for the proposition that the failure to include a regular education teacher significantly impeded the Parents' participation in the formulation of M.D.'s IEP.  Pls.' Opp. Mem. L. at 3.  In *Matrejek*, both the IHO and SRO agreed that the CSE was improperly constituted because it did not include either a regular education teacher or a special education teacher of the middle school the child was entering.  471 F. Supp. 2d at 421, 423.  However, the IHO found that that the composition of the CSE did not deprive the child of a FAPE, while the SRO concluded otherwise.  *Id.* at 423.  The SRO noted that "no one at the [CSE] meeting was able to discuss the specific curriculum requirement of the proposed inclusion class" being recommended for the child.  *Id.*  Further, since neither teacher present at the CSE taught middle school, they could not comment on the modifications and supplementary programs that could be provided to the child to ensure that he made progress in the general curriculum.  *Id.*  In deferring to the SRO's opinion, the court was "unable to conclude that the SRO's determination [, that failure to include a middle school teacher familiar with the proposed inclusion programs was unduly prejudicial,] was incorrect (or, for that matter, that the IHO's contrary conclusion was correct).  [The court] would be substituting [its] own uniformed judgment for the opinions of persons with far greater expertise without having any basis to do so, in violation of the law in this Circuit."  *Id.* at 426.  In contrast to the situation in *Matrejek*, here the CSE included Ms. Doyle, a ninth grade special education teacher, who would have been involved in M.D.'s ICT English class and, furthermore, the record indicates that the CSE was able to discuss the specifics of the proposed ICT classes.

"duplicate" of Kildonan, it is not clear what role, if any, a ninth grade regular education teacher could have played in the CSE discussion. In light of the evidentiary support for the SRO's factual findings, and taking into account the "due weight" that should be accorded to the SRO's determination, particularly where, as here, the parties have not presented additional evidence, a preponderance of the evidence does not show that the failure to include a ninth grade regular education teacher on the CSE was legally inadequate.

### b. Lack of Discussion of Goals

As a second procedural error, the Parents argue that the District's failure to discuss M.D.'s goals at the CSE meeting resulted in predetermination of M.D.'s goals because the Parents were deprived of the ability to meaningfully participate in the CSE process.[27] To support this claim, the Plaintiffs point out that the goals in the final IEP, which were identical to those in the draft IEP, failed to account for M.D.'s present levels of performance. Pls.' Mem. L. at 10-14.

Under the IDEA, a school district may not finalize an IEP before the start of a CSE meeting. 34 C.F.R. Part 300, App'x A, Question 32 . However, a school district is permitted to develop a draft IEP prior to a CSE meeting "[s]o long as they do not deprive parents of the opportunity to meaningfully participate in the IEP development process . . . ." *M.M. ex rel. A.M. v. N.Y.C. Dep't of Educ.*, 583 F. Supp. 2d 498, 506 (S.D.N.Y. 2008) (citing *Deal v. Hamilton Cnty. Bd. of Educ.,* 392 F.3d 840, 858 (6th Cir. 2004) ("Participation must be more than a mere

---

[27] As discussed above, the SRO erroneously determined that the Parents had not challenged the issue of predetermination, and thus did not address the issue in his opinion. However, the SRO devoted substantial discussion to the evidentiary basis for the District's IEP recommendations and the adequacy of M.D.'s goals. SRO Dec. at 18-23. Accordingly, the Court will review the objective evidence in the record to determine whether the SRO's determinations regarding M.D.'s goals are entitled to deference in the absence of a specific conclusion regarding predetermination. *See infra* n. 19 for a discussion of the two distinct procedural violations which may arise from the CSE's failure to discuss M.D.'s goals and which the Parents, as did the IHO, now treat as one violation.

form; it must be *meaningful*.") (emphasis in original)).  Thus, District evaluators can "prepare

reports and come with pre[-]formed opinions regarding the best course of action for the child as

long as they are willing to listen to the parents and parents have the opportunity to make

objections and suggestions." *M.M. ex rel. A.M*, 583 F. Supp. 2d at 506 (quoting *Nack ex rel.*

*Nack v. Orange City Sch. Dist.,* 454 F.3d 604, 611 (6th Cir. 2006) (citations and internal

quotations omitted) and citing *W.S. v. Rye City Sch. Dist.,* 454 F. Supp. 2d 134, 147-48

(S.D.N.Y.2006) (equating draft IEPs containing proposed placements with predetermination

"will inevitably lead to gamesmanship in the preparation of IEPs by CSEs, with the district

withholding points of view that ought to be out on the table and subject to discussion and

parental challenge . . . prior to the document's finalization.")).

　　　Here, the Parents argue that the District's failure to discuss M.D.'s goals at the CSE

meeting deprived them of their right to participate in the CSE review process.  Pls.' Mem. L. at

10-11.  However, in his decision, the SRO found:

> [T]he lack of discussion about the goals during the April 2009 CSE meeting did
> not, by itself, render the goals deficient, considering that the parents received the
> draft IEP in advance of the CSE meeting, and according to the evidence contained
> in the hearing record, were afforded the opportunity to meaningfully participate in
> the review process . . . [C]onsistent testimony from the district director, special
> education coordinator, and resource room teacher confirmed that the CSE would
> conduct a 30-day review after the start of the 2009-10 school year, adjust to the
> student's IEP as necessary, and the resource room teacher expressed confidence
> that she could have met all of student's identified needs in the ELA resource
> room.

SRO Dec. at 23.  Although the SRO was not specifically addressing the issue of

predetermination, this Court's review of the record supports the SRO's finding that the Parents

were afforded a meaningful opportunity to participate in the development of M.D.'s IEP.

First, during the CSE meeting, the Parents repeatedly made school officials aware of their disapproval of the District's proposal.  CSE Tr. 36-53.  Second, the Parents independently raised Dr. Mattis' report and specifically asked the District to address his findings.  *Id*. 41-43.  Third, when asked what program they wanted for M.D., the Parents stated that they wanted a program that would mirror what their son was receiving at Kildonan, and thus did not engage the District in conversation regarding the proposed program.  CSE Tr. 41, 44.  Fourth, the final IEP explicitly notes the Parents' support for Orton-Gillingham instruction and their concern that a transition away from Kildonan would increase M.D.'s stress levels.  SD Ex. 3 at 6-7.  Finally, after receiving the final IEP, the Parents sent a letter to the District discussing their disapproval of the proposed program and stated that they had "shared with the committee, *in length*, [their] serious concerns and reasons why [they] object[ed]" to the District's recommendation.  SD Ex. 11 at 1 (emphasis added).

Having reviewed the record, the Court finds no basis for the Parents' contention that they did not have a meaningful opportunity to participate in their son's IEP development because the CSE failed to discuss M.D.'s goals.  *Compare Nack ex rel. Nack*, 454 F.3d at 610-11 (holding that predetermination did not take place when, during three separate meetings for child's seventh grade IEP, child's mother repeatedly made school officials aware of her disagreement with their proposal and her desire for her son to remain in a regular education setting), *with Woods v. Northport Pub. Sch.*, 2012 WL 2612776, at *8-9 (6th Cir. July 5, 2012) (finding that parents had been denied meaningful participation when they had explicitly requested that the child's goals be developed at the IEP meeting and instead the district arranged to have staff members write the child's academic goals after the meeting with parents); *Deal*, 392 F.3d at 855-59 (finding predetermination where the school district had an unofficial policy of refusing to consider certain

programs regardless of the child's needs and the parents were not allowed to ask questions during the IEP meeting); and *Spielberg ex rel. Spielberg v. Henrico Cnty. Pub. Schs.,* 853 F.2d 256, 259 (4th Cir. 1988) (finding predetermination where the school resolved to educate the child at one school and then created the IEP to carry out their decision).

Here, in contrast, the Parents were provided with a draft IEP prior to the CSE meeting and were allowed to comment on it during the meeting.  The evidence shows that the District considered their suggestions as they were explicitly discussed in the final IEP.  "The fact that the District staff ultimately disagreed with the opinions of plaintiffs and their outside professionals does not mean that plaintiffs were denied the opportunity to participate in the development of the IEP[], or that the outcome[] of the CSE meeting[] [was] 'pre-determined.'  A professional disagreement is not an IDEA violation." *P.K. ex rel. P.K. v. Bedford Cent. Sch. Dist.*, 569 F. Supp. 2d 371, 383 (S.D.N.Y. 2008).  In the end, there is sufficient evidence in the record to support the SRO's finding that the District did not predetermine M.D.'s fate prior to the CSE meeting.

As a related argument, the Parents claim that M.D.'s goals were prepared by Ms. Hines and Ms. Doyle with minimal knowledge of M.D.; they relied only on a "two year old neuropsychological evaluation [by Dr. Mattis]," "outdated District testing," and "notes from Ms. Doyle."  Pls.' Mem. L. at 10.  As noted by the IHO, Ms. Hines testified that she did not have documentation regarding's M.D.'s present levels of performance when creating the draft IEP.  IHO Dec. at 30.  Thus, the Parents take the position that the information discussed at the CSE meeting regarding M.D.'s present levels of performance was not used to develop M.D.'s final IEP goals and the "[draft] goals [] remained unchanged in the [final] IEP, bereft of any current knowledge of the child's academic functioning."  Pls.' Mem. L. at 10.  This failure, they argue,

deprived M.D. of a FAPE.  As both the IHO and SRO agree that the goals were not modified

from the draft IEP to the final IEP, the question for this Court is whether the failure to modify the

goals after additional information was presented at the CSE meeting is evidence of

predetermination.

Under the IDEA, a district is simply required to "*review*" a child's initial and recent

evaluation results when creating an IEP.  *Brennan v. Reg'l Sch. Dist. No. 1 Bd. of Educ.*, 531 F.

Supp. 2d 245, 274 (D. Conn. 2008) (emphasis in original); 20 U.S.C. § 1414(d)(3)(A)(iii).  Here,

the SRO's opinion, as well as an objective review of the record, shows that the District complied

with this requirement.  As an initial matter, Plaintiff simply ignores the fact that Dr. Lane,

Kildonan's Academic Dean, provided valuable information regarding M.D.'s current levels of

performance during the CSE meeting, even if Dr. Lane was recounting M.D.'s progress as

provided to him by the child's math and language training teachers.  In addition, the District

prepared a draft IEP prior to the CSE meeting and discussed additional evaluation data regarding

M.D.'s present levels of performance at the meeting itself, including:  (1) Dr. Mattis'

recommendations regarding M.D.'s need for small classes; (2) Mr. Mulhern's observation at

Kildonan; (3) Mr. Zito's psychoeducational re-evaluation results, Kildonan observation and

discussion with M.D.'s Kildonan teachers; and (4) testimony from the Parents regarding M.D.'s

progress at Kildonan and need for small classes and Orton-Gillingham instruction.  *See* SRO

Dec. at 21.  After consideration of this evaluation data, the District witnesses testified that the

draft IEP was appropriate.  For example, Ms. Hines' testimony at the impartial hearing indicates

that as a result of the information provided by Dr. Lane at the CSE meeting, she concluded that

the goals contained in the IEP were appropriate.  IHO Tr. 670.  "Nothing in IDEA requires the

district to change its initial views of what is appropriate after it reviews new evaluation data."

*Brennan*, 531 F. Supp. 2d at 274; *see also T.S.,* 10 F.3d at 89-90 (holding that an outside

evaluation was appropriately "considered" by the District when it was read at a meeting, but not

distributed to Planning and Placement Team members prior to the meeting).

## C. Substantive Adequacy

### a. The Substance of the IEP

An IEP is substantively adequate if it "provides personalized instruction with sufficient

support services to permit the child to benefit educationally from that instruction." *D.D-S. v.*

*Southold Union Free Sch. Dist.*, 09 Civ. 5026 (JS) (WDW), 2011 WL 3919040 (E.D.N.Y. Sept.

2, 2011) (quoting *Rowley,* 458 U.S. at 203) (internal quotation marks omitted).  As stated above,

the IEP must "be reasonably calculated to enable the child to receive educational benefits,"

*Gagliardo*, 489 F.3d at 107 (citation and internal quotation marks omitted), "likely to produce

progress, not regression,'" and afford the student with an opportunity greater than mere "trivial

advancement." *Cerra*, 427 F.3d at 195 (quoting *Walczak,* 142 F.3d at 130) (internal quotation

marks omitted).  However, a school district is not required to provide "every special service

necessary to maximize each handicapped child's potential," *Cerra,* 427 F.3d at 195 (citation and

internal quotation marks omitted), or "everything that might be thought desirable by loving

parents." *Walczak,* 142 F.3d at 132 (citation and internal quotation marks omitted).  Moreover,

there is "a strong preference for children with disabilities to be educated, to the maximum extent

appropriate, together with their non-disabled peers."  *Walczak,* 142 F.3d at 122 (citation and

internal quotation marks omitted).

"Because administrative agencies have special expertise in making judgments concerning

student progress, deference is particularly important when assessing an IEP's substantive

adequacy." *Cerra,* 427 F.3d at 195.  "Deference is likewise appropriate where, as here, the

district court's review is limited to the administrative record on which the SRO based his decision." *P.K. ex rel. P.K.,* 569 F. Supp. 2d at 384.  Further, a court cannot choose between the competing views of experts on matters of educational policy or substitute its own judgment for that of the hearing officers which it reviews.  *Id.* (citing *Briggs v. Bd. of Educ. of Conn.,* 882 F.2d 688, 693 (2d Cir. 1989); *A.E. v. Westport Bd. of Educ.,* 463 F. Supp. 2d 208, 220 (D.Conn. 2006)).  When deciding whether a school district has met its obligations under the IDEA, a court "must examine the record for any objective evidence indicating whether the child is likely to make progress or regress under the proposed plan."  *Cerra,* 427 F.3d at 195 (citation and internal quotation marks omitted).

Plaintiffs urge the Court to conclude, as the IHO did, that M.D.'s IEP was substantively inadequate because the ICT setting, with 22 to 25 students, was not suited to M.D.'s needs. First, Plaintiffs argue that the SRO gave insufficient weight to the testimony of Dr. Mattis, a private neuropsychologist, who recommended a small class setting for M.D., to keep him focused on a particular task, to limit distractions and for his teachers to be aware when he is "off [the] mark."  IHO Tr. 1230; Pls.' Mem. L. at 17-19.  Plaintiffs claim that "absent from the SRO's analysis is any reference to the unequivocal testimony of Dr. Mattis that [M.D.] could not function in a classroom of up to 25 children and two teachers."  Pls.' Mem. L. at 20.  Instead, Plaintiffs assert that, the SRO disregarded Dr. Mattis' testimony in favor of the testimony of the District witnesses, specifically the testimony of Ms. Doyle and Ms. Hines, which resulted in an impermissible credibility assessment.  The Parents cite to *R.E. v. N.Y.C. Dep't of Educ.*, 694 F.3d 167 (2d Cir. 2012) to support their proposition.  Pls.' Mem. L. at 21.  In *R.E.*, however, the SRO specifically relied on the testimony of a teacher who was promising additional classroom support that was not included in the IEP.  694 F.3d at 192-94.  That is not the situation here.

The SRO's decision indicates that he did not, as Plaintiffs argue, fail to consider their evidence regarding M.D.'s need for a small class size.  The SRO explicitly considered Dr. Mattis' 2007 neuropsychological evaluation, which concluded that M.D. required "a small class size (8:1)."  SRO Dec. at 5.  The SRO also considered the substance of the discussion of the CSE meeting, *id*. at 9-10, where an objective review of the evidence indicates that the Parents and the District discussed Dr. Mattis' recommendation for a small class size and at which Dr. Lane stated that M.D. had benefited from small classes.  CSE Tr. 14, 41-43.  *See generally E.M. v. N.Y.C. Dep't of Educ.*, 09 Civ. 10623, 2011 WL 1044905, at *8 (S.D.N.Y. Mar. 14, 2011) (addressing an SRO's consideration of both parties' evidence in light of a claim by the Parents that the SRO failed to consider evidence in their favor).

Along the same lines, the Plaintiffs also argue that the SRO had "no basis" upon which to conclude that the IEP was designed to meet M.D.'s individual needs.  Pls.' Mem. L. at 14.[28]  The Plaintiffs mainly contest that M.D. could have functioned in the ICT setting and fault the SRO for failing to mention in his opinion that M.D.'s classes could include up to 25 students.  *Id*. at 20.  The Court notes that the Plaintiffs have failed to cite any caselaw to support this argument. However, the Court's review indicates that there was sufficient evidence in the record for the SRO to conclude that M.D. could function in an ICT setting, and that the IEP treatment plan would benefit M.D.

First, Mr. Mulhern, the Director of Pupil Personnel Services for the District, testified that M.D. would make progress under the proposed IEP, basing his opinion both on the information

---

[28] In support of their argument, the Plaintiffs claim that Mr. Mulhern removed M.D.'s second language exemption without having "a single clinical opinion."  Pls.' Mem. L. at 14.  As the Plaintiffs did not appeal the District's decision to remove their son's second language exemption, this matter is not before the Court.  *See infra*, Section II. D. "SRO Decision."

made available at the CSE meeting and the educational profiles of similar students who now participated in ICT classes.  IHO Tr. 347, 413.  Although the ICT classes had anywhere from 22 to 25 students, Mr. Mulhern explained that the ratio was approximately 12:1 since there was both a regular education teacher and a special education teacher in the classroom.  *Id.* 107.  Mr. Mulhern opined, based on his substantial professional experience,[29] that M.D. could succeed in ICT classes as they have a full-time special education teacher "whose primary job is to know what the accommodations are so M.[D.] can function in a general ed. setting."  *Id*. 111.  Further, Mr. Mulhern had visited Kildonan on the day prior to the CSE meeting and had watched M.D. in his "one-to-one observation."  *Id.* 245-46.

Second, Mr. Zito, the school psychologist, echoed Mr. Mulhern's opinion that M.D. would perform well in an ICT setting of up to 25 students.  Mr. Zito based his belief on M.D.'s performance and the performance of students with needs similar to M.D. in the District's integrated model.  *Id*. 514-15.  Mr. Zito was familiar with M.D. as he had conducted several observations of the student at Kildonan since the 2005-06 school year, performed updated academic achievement testing, and conducted two psychoeducational re-evaluations.  *Id.* 476-77, 561.  He had also visited Kildonan a week before the CSE meeting, had observed M.D. in two classes over a two hour period, and spoken to M.D.'s reading instructor and physical science teachers.  SD Ex. 6 at 1; IHO Tr. 502-03, 566.  Third, Ms. Doyle, M.D.'s proposed ICT English special education teacher and a former employee of Kildonan, and Ms. Hines, the district coordinator for special education, agreed that "the team approach utilized by the ICT classes at the district high school would have addressed [M.D.'s] reading difficulties" and Ms. Doyle

---

[29] Mr. Mulhern has 38 years of experience in the areas of child welfare and education and is certified by the State as a Special Education Teacher.  IHO Tr. 58-59.

"would have provided [M.D.] with the supports he needed to receive an educational benefit."
SRO Dec. at 24 (citing IHO Tr. 652, 817). Finally, the District's witnesses provided ample
testimony regarding the additional resource room supports, with smaller student to teacher ratios,
to be provided to M.D. to help him with his specific academic needs.

Other than the IHO's determination and the Parents' testimony as to M.D.'s progress, the
main evidence against the District's position is the testimony of Dr. Mattis, discussed above,
who acknowledged that he had not observed any of the District's proposed classes, had not
communicated with anyone at Kildonan regarding the services that the school provided M.D. for
the 2009-10 school year, and did not know the specific sizes of M.D.'s classes for that year. IHO
Tr. 1301-03, 1314-15, 1330.

In light of the evidence in the record, the SRO was justified in concluding that the IEP
was reasonably calculated to provide M.D. with educational benefits as required by the IDEA
and would allow M.D. to make educational progress, and not regress. "That the size of the
integrated classes in which [M.D.] was offered a placement was larger than his parents desired
does not mean that the placement was not reasonably calculated to provide educational benefits."
*M.W. ex rel. S.W. v. N.Y.C. Dep't of Educ.*, 869 F. Supp. 2d 320, 335 (E.D.N.Y. 2012).[30]   Also,

---

[30] The Plaintiffs argue that "a child's need for small class size in order to access his education is a recognized
consideration in determining whether a proposed placement is appropriate" and cite, *inter alia*, *Gellert v. Dist. of
Columbia Pub. Sch.*, 435 F. Supp. 2d 18 (D.D.C. 2006) and *C.B. v. N.Y.C. Dep't of Educ.*, 02 Civ. 4620 (CLP), 2005
WL 1388964 (E.D.N.Y. June 10, 2005). Pls.' Opp. Mem. L. at 6-7. However, those cases are inapplicable here. In
*Gellert*, the court determined that a child needed a small classroom because the plaintiffs submitted additional
evidence to the court regarding class size and "importantly, Defendant did not challenge the accuracy of the
statements Plaintiffs submitted." 435 F. Supp. 2d at 25. Here, the Parents did not submit additional evidence in
connection with their motion for summary judgment and the District contested the issue of class size. In *C.B.*, both
the IHO and SRO agreed that a child with autism would benefit from small classes and the issue before the court
related to the adequacy of the parents' private placement, and not the substantive adequacy of the school district's
IEP, which both officers had found to be inadequate. 2005 WL 1388964, at *1, 21.

the Court is not at liberty to favor Dr. Mattis' opinion, that of a privately hired expert, over the deference that should appropriately be accorded to the District in matters of educational policy. *E.S. ex rel. B.S. v. Katonah-Lewisboro Sch. Dist.*, 742 F. Supp. 2d 417, 436 (S.D.N.Y. 2010), aff'd, 2012 WL 2615366 (2d Cir. July 6, 2012) ("The mere fact that a separately hired expert has recommended different programming does nothing to change [the] ... deference to the district and its trained educators.") (quoting *Watson v. Kingston City Sch. Dist.*, 325 F. Supp. 2d 141, 145 (N.D.N.Y. 2004), aff'd, 142 F. App'x 9, 10 (2d Cir. 2005)) (internal quotation marks omitted).

Therefore, the Court finds that the preponderance of the evidence supports the SRO's well-reasoned conclusion that the IEP was reasonably calculated to enable M.D. to receive educational benefits. Having concluded that the District offered M.D. a FAPE for the 2009-10 school year, the Court need not reach Plaintiffs' claims regarding their unilateral placement of M.D. at Kildonan. *See T.P. ex rel. S.P. v. Mamaroneck Union Free Sch. Dist.*, 554 F.3d 247, 254 (2d Cir. 2009) (upon a finding that an IEP is procedurally and substantively adequate, the court need not evaluate the services provided by the parents); *Gavrity v. New Lebanon Cent. Sch. Dist.*, 05 Civ. 1024 (NAM) (DRH), 2009 WL 3164435, at *33 (N.D.N.Y. Sept. 29, 2009) (same).

### D. Plaintiffs' Additional Claim - Lack of Spelling Goals

As a final matter, the Plaintiffs argue for the first time in this proceeding that M.D.'s IEP failed to include any spelling goals, relying on the SRO's *sua sponte* finding that the final IEP did not include such goals. Pls.' Mem. L. at 13. The SRO ultimately found that this error was harmless, but the Plaintiffs disagree. SRO Dec. at 23; Pls.' Mem. L. at 13.

Plaintiffs failed to raise their objection to the lack of spelling goals in their amended due process complaint. SRO Dec. at 12; SD Ex. 1 at 1-12. The IDEA and federal and state

regulations require that the party requesting the impartial hearing "lay out specifically in the due process complaint the issues that will be before the hearing officer." *C.F. ex rel. R.F. v. N.Y.C. Dep't of Educ.*, 11 Civ. 00157 (LTS), 2011 WL 5130101, at *12 (S.D.N.Y. Oct. 28, 2011) (citing 20 U.S.C.A. § 1415(f)(3)(B); *R.B. ex rel. A.B. v. Dep't of Educ. of the City of New York*, No. 10 Civ. 6684 (RJS), 2011 WL 4375694, *6–*7 (S.D.N.Y. Sep.16, 2011)). "The party who requests an impartial hearing is restricted to the issues raised in their due process complaint, unless the complaint is amended prior to the hearing or the other party consents." *C.F. ex rel. R.F.,* WL 5130101, at *12 (citing 20 U.S.C.A § 1415(c)(2)(E), (f)(3)(B); 34 C.F.R § 300.511(d); 8 N.Y.C.R.R. § 200.5(j)(1)(ii)). Thus, the Plaintiffs' failure to raise the lack of spelling goals in their amended due process complaint "foreclosed its proper consideration." *Id.* Moreover, the SRO's well-reasoned disposition of the issue in the District's favor deserves deference as this is a question of educational policy. *See id.* (citing *Cerra*, 427 F.3d at 195).

## IV. CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for Summary Judgment is DENIED and Defendants' Motion for Summary Judgment is GRANTED. The Clerk of the Court is respectfully directed to terminate the motions. Docs. 9, 11.

SO ORDERED.

Dated:    January 2, 2013
          White Plains, New York

Edgardo Ramos, U.S.D.J.

46